Henry Epstein, J.
The instant action was commenced by the plaintiff for an accounting of the affairs of the partnership between the plaintiff and defendants pursuant to a partnership agreement dated February 3, 1942 and modified February 10, 1942 which remained in effect until May 21, 1947. A subsequent agreement was entered into on the latter date and continued until approximately July 31, 1950, at which time the said partnership was dissolved and the parties proceeded to arbitration as called for in the second partnership agreement. The sole issue submitted to this court at this time is the issue of res judicata as raised by the third separate and distinct defense.
The plaintiff Albert G-utwirth (respondent in the arbitration) is the son of defendant Charles Gutwirth and the nephew of defendant Isidore Lipschutz (petitioners in the arbitration). The defendants have been partners in the jewelry business for about 50 years. They started working together in Antwerp and continued there until about 1938 when Isidore came to this country to set up business. Shortly thereafter Albert came over and went to work for the New York firm of Isidore Lipschutz, Inc. Charles Gutwirth also came to this country around 1938 but he returned to Antwerp and later returned with his family (less Albert who was already here).
Isidore Lipschutz has a daughter, but no son. Charles Gutwirth has a daughter and two sons. Isidore and Charles wanted to take a less active interest in the business and so devote themselves to less burdensome tasks. To effectuate this inclination it was necessary to have some member of the family carry on the business in their behalf. Albert was the chosen successor because Isidore had no son and Charles ’ other son Marc was not interested in the business but rather in the higher educational pursuits.
Albert started his training in Antwerp as a young lad of 16 or 17 and he continued when he came to this country in the family firm of Isidore Lipschutz Inc. While so engaged he was paid approximately $200 per week. In 1942, it was decided that Albert be made a partner and so an agreement was entered into dated February 3, 1942 creating a new partnership wherein Albert was to have a 20% interest. His father and uncle each retained 40% interests. Albert’s capital contribution amounted to $15,000 which he had earned while working for Isidore Lipschutz, Inc. Albert claimed that for his contribution of $15,000 bis father and uncle were giving him a one-fifth interest *66 in a $5,000,000 inventory, consisting principally of diamonds purchased in Mexico. There were also other assets in the partnership though Albert alleged that their true value was hidden. At this time Albert was about 20 or 21 years old. From then on he actually worked little in the business. Shortly after the 1942 agreement he went to work in a war plant and was subsequently drafted into the Army. His Army tour took him to Europe and while in the service he sustained certain injuries which were alleged to have effected a change in his personality after his discharge. The nice boy who entered the Army returned as an aggressive, eccentric and insulting person, suspicious of the activities of his uncle, and who voiced his feeling that there existed an unnatural love between his father and his uncle. To Albert his uncle was a crook and his father had the philosophy of a beggar. His own sister describes him as “ peculiar ” after his return.
On May 21, 1947 the last partnership agreement affecting Albert was executed. Under cross-examination in the arbitration, Albert stated he felt that when he signed the agreement his grievances about the books were being corrected. The said agreement provided in part that ‘ ‘ the capital of the partnership shall be such sum as each of the parties hereto is credited with as his capital contribution as of the date hereon on the books of the partnership ” (par. 4) and in answer to an inquiry as to the import of those words, Albert answered that those words were not very important.
At the time of the signing of the 1947 agreement Albert was suspicious of his uncle but had insufficient grounds on which to base that feeling. After the agreement was signed, the breach widened and the clash of personalities became more pronounced. Efforts were made to bring about a rapprochement but to no avail. Finally the defendants, father and uncle, notified plaintiff of their desire to seek arbitration; there followed an arbitration lasting three years, which included 74 sessions and over 6,000 pages of testimony. The cost of the arbitration, excluding attorneys’ fees, was $92,555.69. The award of the arbitrators fixed respondent’s (plaintiff herein) share in the liquidation of the partnership at $218,677.47. This has been paid.
Midway through the arbitration this action was commenced. Thereafter Albert (plaintiff here) made a motion in this court to stay the arbitration and defendants moved to stay this action. Both motions were argued before Mr. Justice Schreiber and he granted defendants ’ motion except to the period prior to May 21, 1947, and in like manner Albert’s motion was denied except as to pre-1947 alleged diversions to Carewell. The first sentence *67 of the first paragraph and the first sentence of the last paragraph of Justce Schreiber’s opinion (May 15, 1953) furnish what was thought to be the import of his ruling. They read as folliws:
‘ ‘ The complaint in the present action against Carewell Trading Corporation is predicated upon alleged diversions of partnership funds by Charles Gutwirth and Isidore Lipschutz to the defendant corporation prior to the making of the 1947 partnership agreement as well as subsequent thereto. * * *
“ The motion is accordingly granted only to the extent of enjoining submission to arbitration of alleged diversions claimed to have occurred prior to the making of the 1947 partnership agreement ”. (Italics supplied.)
The order entered upon the above decision reads in part as follows: ‘ ‘ Ordered, that the motion is granted to the extent of enjoining the arbitrators presently acting under the arbitration clause in the May 21, 1947 agreement from making any determination in respect to diversions to Carewell Trading Corp. of moneys, property or assets of or derived from the partnership of IÁpschuts $ Gutwirth occurring prior to May 21 1947 ”. (Italics supplied.)
In the paragraph immediately preceding the first decretal paragraph of the foregoing order the following was stricken out by Justice Schreiber : ‘ ‘ and having determined and decided that the arbitration clause in the May 21, 1947 agreement is not broad enough to permit the arbitrators presently acting under such clause to make any determination in respect to any diversions occurring prior to May 21, 1947; and that the arbitrators may pass only upon matters subsequent to the making of the May 21, 1947 agreement”.
In the first decretal paragraph of the same order the following was stricken out: “and to the extent of enjoining petitioners in the arbitration proceeding any question or issue, claim or cause of action based upon or arising out of diversions claimed by plaintiffs in the above action, or by respondent in the arbitration, to have occurred prior to May 21, 1947 ”.
In the arbitration proceeding commencing at page 3245, the meaning of Justice Schreiber’s order is discussed. It is evident that great doubt existed as to the intent of the order and in fact both sides agreed that they did not understand its meaning. At page 3251, the following colloquy best demonstrates counsels’ understanding (or lack of understanding) of the order.
‘ ‘ Mr. Goldwater: The result of it is that I think I manifested to you that I intend to try to take an appeal.
“ The Chairman: Mr. Goldwater, what is your interpretation of the orderf
*68 ‘ ‘ Mr. Goldwater: I wish I knew. That is why I hope to get a clarification of this from an Appellate Court, and I have so indicated to Judge Rifkind. I don’t know what his feeling is about it, but that is mine. I don’t know whether he is satisfied with it. I certainly am not. It does not give the parties sufficient guidance.
“. Mr. Rifkind: Since I do not understand it, 1 am unable to say whether it pleases me or not.” (Italics supplied.)
Later on in the arbitration, after the orders had been signed, the following colloquy took place:
“Mr. Rifkind: * * * I have read the order of Mr.
Justice Schreiber, and I think that Mr. Goldwater will agree with me as to its impact on this arbitration, in one sentence: that the arbitrators are stayed from making any findings as to Carewell prior to May 21,1947, and that is all.
‘ ‘ The Chairman: That was our interpretation when we read it.
‘ ‘ Mr. Rifkind: And you agree Í
‘ ‘ Mr. Goldwater: I have a copy of the order here. ’ ’
At page 3417 we find the following :
‘ ‘ Mr. Goldwater: He is trying to answer questions about 1942 and 1947. The decision of Judge Schreiber indicates that nothing with regard to that peños [sic] is within the scope of the arbitration.
“ The Chairman: No, that was never said.
‘ ‘ Mr. Goldwater: I said the decision of Judge Schreiber.
“ The Chairman-. Only for Caretvell.
“ Mr. Goldwater: You are speaking of the order. I am talking about the Judge’s reasoning and logic, and the principle that something gets decided when we go to a Court. We don’t go right on litigating things which have already been determined.
‘ ‘ The Chairman: We have overruled your objection. ’ ’ (Italics supplied.)
Further on, at page 3420, we have this: ‘ ‘ The Chairman: All matters relative to Carewell cannot be mentioned in the period 1942 to 1947, following the order, Carewell alone.”
Despite the apparent lack of understanding of Justice Schreiber’s order there was no reargument or resettlement and no appeal taken. The record before the arbitrators, subsequent to the order as well as before it, is replete with testimony antedating the 1947 agreement. Each side initiated such testimony on direct and pursued it on cross and they were assisted in this pursuit by all the arbitrators. Nevertheless, there were tipies when they stood on the supposed meaning of the order, i.e., that *69 nothing relating to the pre-1947 agreement be allowed in evidence.
The respondent questioned defendant Lipschutz about transactions that took place prior to 1942 and attempted to show a connection between those transactions and the first partnership in 1942. An objection was interposed as follows:
‘1 Mr. Finley: In the event the connection is shown, the issue might be different, what transpired prior to 1942 is of no concern in this —
“ Mr. Goldwater (interposing): It is of a great deal of concern, as loill be shown shortly.”
At page 441 the chairman asked respondent’s counsel this question:
1 ‘ The Chairman: Mr. Goldwater, is it your contention that you are questioning the witness concerning matters which became or might have become part and parcel of the 1942 partnership?
“ Mr. Goldwater: That is right, yes it is.” (Italics supplied.)
At page 2081 the opposite position was taken by respondent in objecting to a question posed to Miss Cassutto, the partnership bookkeeper, relating to- the source of Albert’s capital contribution:
“ Mr. Goldwater: Objection is made to that. It goes back to matters before the inception of the partnership.
* * *
‘ ‘ Mr. Finley: * * ° It is Mr. G-oldwater and not us who has introduced records in 1940, 1941, partnership agreements of L. & G. Antwerp and so forth. If he is willing to foreclose anything prior to the time of the partnership, I am perfectly willing to foreclose any questions prior to that time.” (Italics supplied.)
While it is true that the last-quoted statements preceded the order of Justice Schreiber, the same situation prevailed after his order. Each side continued to inquire into the activities of the partnership at least from 1942.
At page 2172 Judge Eifkind expressed himself as follows on the subject matter of the arbitration:
‘ ‘ When I use the word partnership I mean the firm of Isidore Lipschutz, Charles Gutwirth, and Albert Gutwirth, doing business under the name of Lipschutz & Gutwirth, and which firm was established in the year 1947 under a written agreement [a brief interruption by Mr. Finley].
“ I said 1947 and I would prefer not to have even my own co-counsel correct me. That is the partnership whose affairs are before this Board of Arbitration for the resolution of their *70 internal problems, the only partnership whose affairs are before this Board for an analysis of their internal mutual assets and liabilities. There are other business entities which may throw light upon the affairs of the 1947 partnership, but they are not here as such, they are here purely as historical data.”
Much later in the arbitration at page 4159 respondent (plaintiff here) called one Daniels to the stand. The latter was a certified public accountant called to present an analysis of the books and records of the partnership. Immediately after calling Daniels, respondent’s counsel made a statement, part of which follows:
‘ ‘ Mr. Goldwater: * * * I have contended and still contend that the effect of the decision of Judge Schreibbb is that all transactions for the period before May of 1947 are not subject to determination in this arbitration. I recognize that the specific point decided by the Judge involved a suit against Carewell Trading Corporation, and the order entered following conflicting submissions by the attorney for the respective parties as to the form of order related to Carewell Trading Corporation.
“ Mr. Rifkind: * * *
1 ‘ The Chairman: * * *
“Mr. Goldwater: Nevertheless, I take the position that the decision of the Court and the ground for the decision, as indicated in the opinion, makes it clear that there is no power in the Arbitrators to pass upon matters for the period prior to 1947. * * *
“ In proceeding in the arbitration here with my case at this time, 1 am submitting only claims — making contentions and submitting claims as to amounts claimed and alleged to be due my client, Albert Gutwirth, relating to the period since May of 1947.
■k =£ &
‘ ‘ Mr. Rifkind: I say very clearly that I think it takes a certain amount of thick skinitis for counsel for the respondent to advance any such proposition. It ivill be recalled that when these proceedings were first launched, I, on behalf of my client, the petitioners, took the position that this controversy was limited to the proceedings subsequent to May of 1947, the date 'of the partnership agreement.
‘ ‘ I took great pains to advance that and to argue for it. I was overruled. I was overruled because of the arguments made by my adversary, Mr. James Goldwater, that this proceeding necessarily involved the former partnership of 1942 to 1947. He went further and claimed that he was entitled to examine records antedating even the 1942 account.
*71 “ * * * I think, * * * it comes with ill grace for the respondent at this time to make this limiting suggestion. I am very clear in my mind that the Arbitrators will reject this contention.” (Italics supplied.)
Isidore Daniels, thereafter began his testimony during which he outlined a unique system of detecting the movement of diamonds from series to series. As part of this direct testimony he described book entries dating back to 1942. The respondent’s expert also stated that he made a special survey of the section M items for the years 1942 through 1951 inclusive. At page 4397 of the minutes, respondent offered in evidence an exhibit which listed a schedule of systematic reductions in carat values from 1942 to 1951. The chairman chided counsel for respondent for going back to 1942 in light of his earlier pronouncements.
Daniels testified about write-offs as early as 1943. The chairman questioned both Mr. Lipschutz and Albert about the list of assets that were credited as Mr. Lipschutz ’ contribution to the partnership in 1942.
On direct examination Albert was asked about polishing losses and Judge Eifkiitd objected on the ground that the question covers a period when Albert was in the Army. The chairman ruled as follows: “ The Chairman: Will Albert limit his answer to the period of the partnership before us, from 1947 to 1951.”
And so the pendulum swung first to the pre-1947 partnership and then back to the partnership of 1947. That the arbitrators were aware of this there can be no doubt. Near the end of the arbitration record the chairman injected the following comment during the cross-examination of Daniels: 1 ‘ The Chairman: That is argument. I must say that the record will show that either side did not recognize the first partnership at a given moment.”
The memorandum decision of the arbitrators was handed up April 2,1954. On page 5 of the said memorandum the following appears: “A full accounting between the parties, with all of the parties having access to all of the records, was not had prior to this arbitration, and we are determining what the assets of the partnership consisted of on July 31, 1950, in order to decide upon the claims and counterclaims of the parties. In order to ascertain the assets of the partnership, it is necessary to connect the agreement of May 21, 1947 with prior agreements of February 3rd and February 10th, 1942, respectively, entered into by petitioners and respondent.” (Italics supplied.)
The next paragraph of the decision under the title of “ Securities ” we find this: “ But for the language in the purpose clause of the agreements of February 10,1942 and May 21, 1947, *72 there is no pertinent evidence to support the allegations that the 1947 partnership ever engaged in the purchase and sale of securities
Later on in the decision under the sub-title “ Diamonds & Other Assets ” the arbitrators noted the perplexing state of the books and records when they stated: “ Unfortunately, at the inception of the partnership no new books were opened and no new inventory of merchandise was made, so that reconstruction of the assets as of July 31, 1950 is complicated by the absence of a clear point of departure.”
In discussing the sub-titles ‘ ‘ Carewell Trading Corporation ’ ’ and “Charitable Contributions” the arbitrators limited their findings to the period of the 1947 partnership.
During the course of the arbitration, the books of the 1947 partnership as well as those of the pre-1947 partnership were available and offered in evidence. (See minutes, p. 686 et seq., including the following: the General Ledger of Lipschutz & Gutwirth from 1942 to 1947; Lipschutz & Gutwirth Journal from February 1945 to January 1947; and Journal from February 1,1942 to January 31,1945; Lipschutz & Gutwirth accounts payable, containing entries from 1942 through the dissolution of the 1947 partnership; Lipschutz & Gutwirth General Ledger from February 1,1947 to January 31,1951; Lipschutz & Gutwirth Journal — from February 1,1947 to January 31,1951; Lipschutz & Gutwirth Ledger, February 1, 1951; Lipschutz & Gutwirth Journal, February 1, 1951; Lipschutz & Gutwirth Stock Ledger, February 1, 1951; Lipschutz & Gutwirth Co. Inventory Stock Ledger, February 1, 1951; Lipschutz & Gutwirth Co. Sales Book — February 1, 1951; an invoice sales book containing sales from February 2, 1951 through May 20, 1953.)
The respondent (plaintiff herein) had complete access to the books and records of the partnership during the arbitration and the witness Daniels made exhaustive studies of the inventory records. The latter witness testified at length concerning his reconstruction of the sales and stock depletion.
The partnership agreement of May 21, 1947 (par. 12) states in part as follows: “ 12. If any controversy shall arise among the parties hereto, or the executors, legal representatives or administrators of any of them, with respect to the conduct of the partnership business, or of the dissolution of said partnership or by reason of any of the terms and provisions of the within agreement, or with respect to any other cause whatsoever not herein provided for, the same shall be decided and determined by arbitrators in the following manner: * * * ”
*73 It is conceded that the arbitration was properly commenced and indeed at this stage it could not be otherwise — the respondent (plaintiff) received and retained the benefits of a check in the amount of the arbitrators’ aioard and did not appeal the decision confirming that award. The theory is now advanced that the arbitration did not cover the partnership activities under the agreement of 1942. Great weight is placed on the decision of Justice Schreiber (supra).
The amended complaint in the instant action alleges two causes of action. The first cause of action seeks a partnership accounting for the pre-1947 partnership as well as a declaration of a constructive trust to the extent of 20% thereof, of the profits etc., obtained by the individual defendants in their dealings with the corporate defendant. The second cause of action seeks the same relief for the 1947 partnership period. The said second cause of action was stricken by order of Mr. Justice Aurelio (N. Y. L. J., Feb. 17, 1955, p. 7, col. 2).
The history of this litigation has been long and arduous. The summons and complaint was served on or about April 1, 1953. In the original complaint Isidore Lipschutz and Charles Gutwirth were made plaintiffs. In October, 1953, Carewell moved to compel plaintiff to separately state and number its causes of action and the present individual defendants moved to strike their names as plaintiffs. Both branches of the motion were granted.
After the arbitration award Mr. Justice Rabiu granted plaintiff permission to serve an amended complaint (Dec. 29, 1954). In the amended complaint now before the court, plaintiff sues Carewell and the individual defendants. The first cause of action related to the differences that arose as a result of the partnership prior to 1947 and the second cause of action covered the plaintiff’s activities subsequent to May 21,1947.
The defendants moved to strike the second cause of action on the ground that the matters therein contained had been adjudicated before the arbitrators. The motion was granted by Mr. Justice Aurelio on February 16, 1955.
The plaintiff moved to take the deposition of both Carewell and the individual defendants and same was granted (Mr. Justice Saypol, July 28,1955). An appeal was taken- and the order was affirmed by the Appellate Division (286 App. Div. 1001; Oct. 16,1955).
The plaintiff thereafter moved for a discovery and inspection of the books of Carewell and of the partnership of L. & G. for the period 1942 to May 20, 1947. The motion was granted *74 August 8, 1956 by Mr. Justice Epstein. Defendants appealed and the Appellate Division affirmed on October 9, 1956 (2 A D 2d 840).
A motion was made during the discovery and inspection to have a Referee appointed to hear and determine objections of defendants to questions on the examination and discovery. The motion was granted (July 25, 1957, Mr. Justice Fine) and a Referee appointed.
Defendants then moved for permission to serve an amended answer to include the defense of res judicata. The motion was granted (Mr. Justice Lupiano, April 10, 1958).
Defendants moved for a separate and prior trial of the issue of res judicata. The motion was granted (Mr. Justice Mabkewich, July 8, 1958).
The above motions constitute some of the litigated aspects of-the differences between the parties but it is by no means a complete tabulation of the judicial course they travelled. “ These contracts, like all others, must be construed and interpreted with reference to the intent of the parties, insofar as such intent is consistent with the language of the contract. They also should receive a liberal construction, with a view to accomplishing the purpose of the parties, to effect a complete and final settlement of all existing controversies, and to authorize the award made.” (Carmody-Wait, New York Practice, vol. 21, p. 423, citing cases.)
See Ever Ready Linen Supply & Laundry Co. v. Modern-Silver Linen Supply Co. (112 N. Y. S. 2d 806) where it was held that a dispute concerning the interference by defendant with plaintiff’s customer which occurred before, but was not discovered until after it became a signatory to the arbitration agreement was within the jurisdiction of the arbitrators.
A submission by partners specifying particular controversies, but also referring in general terms to all the questions between the parties, may, according to the rule of liberal construction, sustain an award on all partnership matters (Carmody-Wait, New York Practice, vol. 21, p. 428; Locke v. Filley, 14 Hun 139). “ Submissions or provisions for arbitration may be general, that is, of certain specified actions, £ and all other actions and causes of action, ’ or ‘ touching divers other matters ’ as well as those particularly mentioned, or ‘ and all other demands, ’ or £ all demands which either party has against the other,’ so long as it is evident that the parties intended by them to embrace different and more general matter than that which had already been specified. In such a case, where the submission extends to £ all the demands which either party has against the other, ’ *75 whatever constitutes a demand on the one side or the other is included, and the presumption is in favor of an intention that all the matters should be decided ” (Carmody-Wait, New York Practice, vol. 21, pp. 426-427; Jones v. Welwood, 71 N. Y. 208; Munro v. Alaire, 2 Caines 320; Wheeler v. Van Houten, 12 Johns. 311; Owen v. Boerum, 23 Barb. 187).
In Matter of Bercu (Levinson) (270 App. Div. 537) (cited in plaintiff’s reply brief), the Appellate Division reversed an order granting a motion directing a party to submit to arbitration. The court then said: “ The partnership may be dissolved in accordance with law and disputes may arise out of such dissolution which are subject to arbitration, but petitioners may not avail themselves of an arbitration proceeding, as they have sought to do, to force appellant to accede to their proposal for a new partnership or dissolution of the present partnership ”.
The agreement in the Bercu case is similar to the one here considered but the decision in that case is not here pertinent for the reason that the dissolution here is not questioned but rather the problems raised by the dissolution.
In Matter of River Brand Rice Mills v. Latrobe Brew. Co. (305 N. Y. 36) an agreement to arbitrate under a contract of sale was considered. As part of the contract, there was contained the following language: “ Any controversy or claim arising out of or relating to this contract or the breach thereof, shall be settled by arbitration ”. In commenting on the quoted provision, the court stated (pp. 40-41): “When, however, we read the clause as quoted (supra) and find that it refers to 1 Any controversy or claim ’, it is clear that the language is all inclusive and that the parties intended that all controversies, including the present one, should be settled by arbitration. As we said in Matter of Marchant v. Mead-Morrison Mfg. Co. (252 N. Y. 284, 298): ‘ Parties to a contract may agree, if they will, that any and all controversies growing out of it in any way shall be submitted to arbitration. If they do, the courts of New York will give effect to their intention.’ ”
The clause considered in Matter of Bohlinger (National Cash Register Co.) (305 N. Y. 539) provided as follows: “Seventeenth : In the event of any dispute between the parties hereto with reference to any matter not provided for in this Contract, or in reference to the terms, interpretations or application of this Contract, such disputes shall be referred to a Board of Arbitration ”.
In discussing the clause above, the court stated (p. 542): ‘ ‘ There can be no claim' of ambiguity in the language chosen to express what the parties intended * * * The failure to *76 allude specifically to every possible area of dispute should not result in making an arbitration clause unworkable where the parties have specifically said that it was their intention to include ‘ any dispute * * * with reference to any matter not provided for in this Contract (Matter of Lipman [Haeuser Shellac Co.], 289 N. Y. 76, 80.) ”
The clause authorizing arbitration in the instant case parallels the clause in the last-cited base, and the conclusion is inescapable that the language in the arbitration clause here, viz., “ or with respect to any other cause whatsoever not herein provided for, the same shall be decided and determined by arbitration ”, lends itself to the interpretation of our Court of Appeals that it is all-inclusive. The matter contained in the order submitted for Justice Schreiber’s signature (quoted supra) which ivas subsequently stricken out by him as well as the arbitrators’ reference to the necessity to connect the agreements of 1942 and 1947 (supra) plus the fact that the arbitrators were here faced with a partnership accounting wherein they had to strike a balance, lends itself to the only possible conclusion that the accounting for the period prior to 1947 was of necessity considered and determined by the arbitrators.
On May 21,1947 the old partnership, created February 3,1942, was continued with the capital on the books to the credit of each partner. Considered either as an old or a new partnership, the arbitrators compensated Albert for the entire period of both agreements. The courts are reluctant to relitigate what was reasonably within the arbitrators’ powers and what was awarded based on all the evidence before them. (Silberfeld v. Swiss Bank Corp., 99 N. Y. S. 2d 888, 893 [Breitel, J.], affd. 278 App. Div. 676.)
Whatever may have been the condition of the submission at the time of arbitration, there can be little doubt that an effective waiver took place, which permitted the arbitrators to consider the pre-1947 partnership. “ Where the actual submission of the controversy is broader than the description of arbitrable matters in an agreement between the parties, it may amount to a waiver of a limitation in the area of arbitrable controversy.” (Matter of Kessler [National Cas. Co.], 8 A D 2d 105, 108 [First Dept., May 12, 1959].)
While there is much in the record to show that the Carewell transactions prior to 1947 were before the arbitrators; and that they were given consideration in fixing the value of Albert’s interest in Lipschutz & Cutwirth; nevertheless this court cannot override the circumscribed scope of the arbitrators fixed by Justice Schreiber and accepted by the arbitrators.
*77 On the state of the record before the arbitrators, this court concludes that the award of the arbitrators is res judicata of the issue of the partnership accounting for the entire period of the partnership agreements, viz., from February 3,1942, through the agreement of May 21, 1947. It is with reluctance that a portion of the differences between the parties must be set down for trial. The decision of Justice Schreibbb specifically circumscribed the scope of the arbitrators’ jurisdiction re the Garewell diversions and it is clear from the arbitrators’ memorandum that they so limited themselves. As to other matters that are referred to in the said memorandum where by implication it might be argued that the arbitrators followed a limited submission rather than a general one, it is the opinion of this court that the award as made and upon which judgment has been entered, finally and completely adjudicated all rights plaintiff had to an accounting for the period prior to the 1947 partnership agreement, as well as subsequent thereto.
Judgment may be entered dismissing the first cause of action of the amended complaint insofar as it seeks a recovery for matters other than any alleged diversion to Garewell for the period of the 1942 partnership. That is the sole matter which is left open for possible future proceeding.
Submit judgment on notice.